FILED
United States Court of Appeals
Tenth Circuit

September 29, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

JAY MARTIN SCHENE,

    Defendant-Appellant.

No. 07-6177

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. No. CR–06-282-HE)**

---

Robert L. Wyatt, IV, Wyatt Law Office, Oklahoma City Oklahoma, for Defendant-Appellant.

Randal A. Sengel, Assistant U. S. Attorney (John C. Richter, United States Attorney, with him on the brief), Oklahoma City, Oklahoma, for Plaintiff-Appellee.

---

Before **BRISCOE, SEYMOUR,** and **HARTZ**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

---

    Defendant Jay Martin Schene was convicted by a jury of five counts of

knowingly possessing material that contained an image of child pornography that

was produced using materials that had been mailed, shipped, or transported in interstate commerce, in violation of 18 U.S.C. § 2252A(a)(5)(B). Schene contends that: (1) the evidence was insufficient to show that the images of child pornography were produced using materials that had been mailed, shipped, or transported in interstate commerce; (2) the evidence was insufficient to show that Schene committed the crime; (3) the district court abused its discretion by admitting into evidence certain testimony regarding gender and homosexuality; and (4) the district court abused its discretion by admitting into evidence images of child pornography, and related exhibits. We have jurisdiction under 28 U.S.C. § 1291 and affirm.

I.

In February 2005, the Federal Bureau of Investigation ("FBI") in Allentown, Pennsylvania, searched the computer of an individual suspected of having child pornography. In the process, they discovered emails from a second individual, whose screen name with America Online ("AOL") was "skitie33." The FBI served a subpoena on AOL, and AOL disclosed that skitie33 was Donald Black, of Duncansville, Pennsylvania. In April 2005, the FBI executed a search warrant on Black's residence and seized four computers. Black admitted trading child pornography with a number of individuals online, although he could not remember any of their names or screen names.

The FBI performed a search of Black's computer, and one of the screen

names that they uncovered was "outdoorguy104166."[1] The FBI served another subpoena on AOL, and AOL disclosed that the screen name corresponded to the account of Defendant Schene, who lived in Edmond, Oklahoma. Several other screen names were associated with Schene's account, including "ccarlin317," "myebayshades," "ebayshades," and "okseecat." The FBI referred this information to its Oklahoma City office.

In Oklahoma City, FBI special agent William Weaver performed a search of public records and determined that Schene's home address was in Edmond, Oklahoma. Agent Weaver stopped by Schene's home several times to investigate, and eventually, near the end of May 2006, a woman answered the door. Agent Weaver left his business card with her, and he requested that Schene contact him. Later that morning, Schene called Agent Weaver, who asked Schene to come to the FBI office for an interview. Schene agreed.

At the interview, Schene stated that he had never used, or heard of, outdoorguy. Schene admitted, however, that he used two of the other screen names: ccarlin317 and okseecat. He stated that he worked as a financial advisor for Chase Bank, and that he was married to Cathy Carlin, whose email address was carlincathy@yahoo.com. When asked, Schene consented to a search of his home computer, and FBI agents accompanied him to his house to perform the

---

[1] All parties refer to this screen name as "outdoorguy," without including the numbers. We will use the same reference.

search.  During the search, Schene told the agents that there were no children in the house, and only he and his wife used the computer.

The FBI agents searched Schene's computer using a software tool called "Presearch," which finds all of the images on the computer's hard drive and shows them one-by-one.  At first, the agents only saw images of homes and other generic images from the internet, but eventually, images of child pornography began to appear.  Schene denied that the images were his, and he stated that he had no idea how the images had come to be on his computer.  The agents seized the computer.

At the FBI office, Bryan Carter, a computer forensics expert, examined the computer in detail.  Mr. Carter focused on the hard drive because everything on the computer was stored there, and any visual images came from information on the hard drive.  He used several software tools to look for images, and these tools enabled him to search for specific file types—such as images and emails—and to uncover a lot of information about each file.  The tools even enabled him to find files that the user had attempted to delete.

Mr. Carter discovered two operating systems on Schene's computer: Windows XP Professional and Windows XP Home Edition.  The user had to choose between the two operating systems immediately after starting the computer.  Within each operating system were two user names—one for Jay Schene and another for Cathy Carlin—and none of the user names required a

password. The email service on the computer was AOL, and Mr. Carter found all of the screen names that AOL had listed in its response to the FBI's subpoena. He also found the email address book that AOL automatically created for outdoorguy. Included within the address book was the screen name skitie33, which the FBI had previously determined to be the AOL screen name for Donald Black of Duncansville, Pennsylvania, who had admitted trading child pornography with a number of individuals online.

During his search of the computer, moreover, Mr. Carter found over 1900 images of child pornography, about half of which the user had attempted to delete. He discovered most of the images in emails associated with outdoorguy and ccarlin317. He also found pornographic movies involving children, as well as a history of movies that had been "created" and viewed on the computer. Some legitimate emails—i.e., emails not containing child pornography—had been sent from ccarlin317 with Jay Schene's signature at the bottom. There was also a wiper/shredder program on the computer,[2] scheduled to run daily on Cathy Carlin's user profile but accessible from either of the user profiles.

At Schene's trial, the government presented the evidence described above, including the images of child pornography that pertained to each of the five counts in the indictment. In addition, the government read into evidence a

---

[2] A wiper/shredder program is a program that attempts to erase the tracks of internet activity or confidential information.

stipulation to which all parties had agreed, which stated:

> The parties to this case stipulate and agree that the following fact may be accepted as proven:
>
>> The hard drive from the defendant's computer is a Seagate 20 gigabyte hard drive. This hard drive was manufactured in the country of Singapore.

Stip., ROA, Vol. I, at 62; Tr. at 104.

The government then called as a witness Jeffrey Elliott, a captain with the Oklahoma Highway Patrol who had been assigned to the FBI cyber crimes task force to investigate crimes involving computers and the sexual exploitation of children. Officer Elliott testified, without contemporaneous objection from Schene, about the content of the images:

> A    I would say probably 90 to 95 percent of the images that were child pornography were images of young boys. They may be nude by themselves in a sexually provocative position, they may be engaged in a homosexual act with another young boy or an adult male.
>
> Q    And in your experience in working with cyber crimes and these types of investigations, have you ever seen a woman who trafficked in child pornography showing homosexual acts between males?
>
> A    I have not.

Tr. at 107. Officer Elliott also described an exchange of emails between outdoorguy and an individual using the screen names "butwhoishe" and "handsomehorn." The emails contained images of child pornography, and outdoorguy sent and received several such emails within an hour-long period on

6

the evening of April 28, 2006. Officer Elliott explained further that outdoorguy had sent an email to himself, with seventy-six images of child pornography attached, which would have enabled outdoorguy to access these images on other computers. Finally, on redirect examination, Officer Elliott testified:

Q    Now, on the internet history, were there instances you could find where websites with homosexual themes had been visited?

A    Yes, sir. I saw repeatedly, I saw the user under the Jay Martin Schene account visit www.menforsexnow.com, www.menforrentnow.com, www.cruisingforsex.com. And there was an address at library.gaycafe.com that was visited very frequently.

Q    And did you look at a few of these websites?

A    I did. I visited each of those. Each of them are gay oriented for males. They all offered child pornography to view. They are kind of a social networking site where you can post your profile or post an ad requesting to meet with someone and that kind of thing.

Tr. at 126.

As his defense, Schene tried to show that the government had not proven that it was he who had knowingly possessed the pornography. On cross examination, Agent Weaver admitted that he did not know the identity of the woman who first answered the door at Schene's address. He admitted that he never attempted to interview Schene's wife; he never searched her business computer; he never searched Schene's work computer; and he never put together a time-line of Schene's computer usage. Further, Agent Weaver agreed that Schene

7

contacted him very quickly after Agent Weaver left his business card at the residence, and Schene cooperated fully with the investigation—answering all questions and granting the FBI access to his computer. Agent Weaver agreed that families commonly share an AOL screen name and email account, and that neither Jay Schene's nor Cathy Carlin's user name required a password. Schene also questioned Agent Weaver about whether the FBI had unduly focused on Schene—rather than his wife—because Schene was a man:

> A     I believe we asked if he had any children in the home and he said no. And then it was asked whether he had any nephews or nieces that would have access.
>
> Q     You would agree, though, that in your report there's nothing that mentions nieces?
>
> A     Correct.
>
> Q     Your report only mentions there were no nephews in the teenage years?
>
> A     Correct.
>
> Q     You never considered the possibility of a woman viewing these images, did you?
>
> A     We tried to consider all people in the house. In this case, the images were of young boys, young mostly males, and generally you can consider men, but we try to consider both parties.

Tr. at 52. Shortly thereafter, Agent Weaver testified:

> A     You just assumed that a man looked at these images?
>
> Q     Yes.

8

Tr. at 53. On redirect examination, the following exchange occurred:

Q       Has your training with the FBI taught you about the frequency
        with which women traffic in child pornography?

        MR. WYATT:       Your Honor, I'm going to object. Calls for
                         speculation, and there's no foundation for
                         this, and it's beyond *Daubert* and *Kumho*
                         *Tire*.

        THE COURT:       Overruled.

Q       (By Mr. Sengel)   You may answer the question.

A       Yes. It's usually men.

Q       It's very rarely found to be women who traffic in child
        pornography?

                                * * *

Q       So in this instance, that's one of the reasons you were
        focusing on Jay Schene as you go out there?

A       Right. Another reason was when we did the search, the
        computer was kind of -- there was an account for the wife and
        an account for the husband. When the images came up the
        first images that I saw I could see the path where they were
        stored, and it was in the wife's account and they were pictures
        of real estate and different things that she was interested in.
        There were family, I think, trips to a river rafting trip. And I
        could see on the path it was still in her account. And soon as
        that switched to show Jay's account, that's when the images of
        child pornography started popping up.

Tr. at 55-56.

    Likewise, on cross examination, Bryan Carter admitted that neither Jay

Schene's nor Cathy Carlin's user name required a password. A person could have

9

accessed the outdoorguy screen name from either of the user names, and there was no way to determine that Schene was the individual sitting at the computer, viewing the images of child pornography. In addition, Officer Elliott admitted that law enforcement had not conducted a sting to catch Schene in the act of looking at child pornography, and only through the use of a camera could he prove that Schene was the person sitting at the computer looking at the images of child pornography. Officer Elliott further admitted that he never interviewed Cathy Carlin because she refused to talk with him, and he never examined Schene's work computer.

Schene moved for a mistrial at several points. The first time, he argued:

> Your Honor, also the government has advised the Court that it is to show homosexual activity but they have no evidence of homosexual acts or homosexual nature of the defendant. In absence of that I suggest to the Court that it is unduly unfairly discriminatory and an improper suggestion, and even based on previous testimony, I would state that I did not object, but I'm going to now and move for a mistrial on the grounds that you can't assume that someone is homosexual because of information that involves homosexuality or bisexuality that a man looked at it.

Tr. at 82-83. The court denied the motion. Later, after Officer Elliott testified about the images recovered from Schene's computer, the following exchange occurred:

MR. WYATT: I ask the Court for a limiting instruction. There's no evidence to be presented of any homosexual activity by my client of Jay Martin Schene, no evidence from anyone of any evidence they have provided to me, no discovery that he is

10

homosexual, gay, bisexual, and I ask the jury be instructed on that.

THE COURT: What would be the basis for me instructing them what the evidence hasn't shown?

MR. WYATT: Well, I've objected to the fact that they have attempted to introduce this without any *Daubert* showing and without any, it's just opinions of lay people once you get to that point. For a witness to stand up here and say that we've never seen a woman look at pictures of homosexual men, that is totally beyond the scope of the expertise of these people, whether he has seen that or not. It doesn't establish whether it does or does not exist or who might have been looking at any of the images.

THE COURT: Insofar as the *Daubert* related objection, there was a sufficient showing made. Beyond that I don't have any basis to give a limiting instruction on what you're asking for. You can inquire into it on cross and put on your evidence, but at any rate, your request will be denied.

MR. WYATT: For the record I move for mistrial.

THE COURT: Be overruled.

Tr. at 109-10.

Schene called several witnesses to testify on his behalf. First, Jay Penrod, a computer forensics specialist, testified that all of the AOL screen names—outdoorguy, okseecat, ccarlin317, and myebayshades—were originally set up under Cathy Carlin's user profile.[3] He also testified that it was impossible

---

[3] On cross examination, Mr. Penrod admitted that images containing child

(continued...)

11

to identify who was sitting at the keyboard looking at the images of child pornography; that outdoorguy was not necessarily a man; and that family members commonly share one AOL account and often view inappropriate material without other family members knowing. Schene then called three character witnesses, who testified to their opinion of Schene's high character as an honest and law-abiding individual.

Pursuant to Rule 29 of the Federal Rules of Criminal Procedure, Schene moved for a judgment of acquittal—which the district court denied—at the close of the government's case, at the close of Schene's case, and at the close of the government's rebuttal evidence. Ultimately, the jury returned a verdict of guilty on all five counts. The district court sentenced Schene to sixty months' imprisonment, followed by two years of supervised release.

II.

A.    *Sufficiency of the evidence: the interstate commerce element of 18 U.S.C. §
      2252A(a)(5)(B)*

Schene appeals the sufficiency of the evidence as to the "interstate commerce" element of 18 U.S.C. § 2252A(a)(5)(B). He did not raise this issue in

---

[3](...continued)
pornography had been opened and viewed under Schene's user profile. The government also countered Mr. Penrod's testimony by introducing rebuttal testimony from Bryan Carter, who testified that the AOL version on which the screen names were originally installed was older than the version on which many of the images were viewed.

his Rule 29 motions for judgment of acquittal, so we review for plain error.  See

United States v. Schaefer, 501 F.3d 1197, 1199-1200 (10th Cir. 2007); see also

United States v. Goode, 483 F.3d 676, 680-81 & n.1 (10th Cir. 2007).[4]  "To

obtain relief under this doctrine, [Schene] must show: (1) an error, (2) that is

plain, which means clear or obvious under current law, and (3) that affects

substantial rights."  Goode, 483 F.3d at 681 (citation and internal quotation marks

omitted).  "If he satisfies these criteria, this Court may exercise discretion to

correct the error if it seriously affects the fairness, integrity, or public reputation

of judicial proceedings."  Id. (citation and internal quotation marks omitted).

The statute at issue, 18 U.S.C. § 2252A(a)(5)(B),  prohibits "[a]ny person"

from

> knowingly possess[ing] any book, magazine, periodical, film,
> videotape, computer disk, or any other material that contains an
> image of child pornography that has been mailed, or shipped or
> transported in interstate or foreign commerce by any means,
> including by computer, or that was produced using materials that
> have been mailed, or shipped or transported in interstate or foreign
> commerce by any means, including by computer[.]

18 U.S.C. § 2252A(a)(5)(B).  To meet the "interstate commerce" element here,

---

[4] Schene argues that he preserved this argument by raising it during a jury instruction conference.  An argument during a jury instruction conference does not preserve a sufficiency-of-the-evidence issue for appeal where a defendant omits it from his Rule 29 motion, and our plain error standard applies here.  Cf. Goode, 483 F.3d at 681 ("When a defendant challenges in district court the sufficiency of the evidence on specific grounds, 'all grounds not specified in the motion are waived.'" (quoting United States v. Kimler, 335 F.3d 1132, 1141 (10th Cir. 2003))).

13

the government has relied solely on the second prong of § 2252A(a)(5)(B)—i.e., that the images of child pornography were "produced using materials that have been mailed, or shipped or transported in interstate or foreign commerce."

At trial, the government's theory was that Schene's hard drive—which was "mailed, or shipped or transported in interstate or foreign commerce"—had "produced" the images of child pornography when it caused them to appear visually on Schene's computer monitor. The parties stipulated that "[t]his hard drive was manufactured in the country of Singapore." Stip., ROA, Vol. I, at 62; Tr. at 104. Also, Bryan Carter testified to the following:

> Q    In the forensic exam when you're focusing on the hard drive, is that because -- for those that didn't grow up with computers, like me, that's where everything is stored?
>
> A    Correct.
>
> Q    And in the instance of like images to be seen on a computer, are those images going to be produced from the information that's on that hard drive?
>
> A    Yes. It is an exact copy of that information.

Tr. at 60.

The government's attempt to prove production of the images by their display on a computer monitor is foreclosed by our decision in United States v. Wilson, 182 F.3d 737, 743 (10th Cir. 1999). In Wilson, the defendant had been

convicted under 18 U.S.C. § 2252(a)(4)(B) (1996),[5] and we reversed the

conviction under the jurisdictional prong of that statute.  We first explained that,

contrary to the government's "extremely vague" theory at trial, and even though

"the evidence was uncontroverted that the diskettes [containing child

pornography] traveled in interstate commerce, there was an alarming lack of proof

that the diskettes were used to actually produce the graphics files."  Wilson, 182

F.3d at 742.  The government's witnesses

> did not support the conclusion that computer diskettes are used to
> actually produce graphics files.  To the contrary, their testimony left
> unanswered the question of whether a computer graphics file is
> produced or created prior to being recorded on a particular storage
> media, or whether, instead, it only comes into being at or after the
> point it is recorded on the storage media.  Although we have no
> doubt this question has an answer (and thus do not foreclose the
> possibility that a diskette is a "material" used to produce a graphics
> file contained thereon), we conclude the evidence produced by the
> government in this case was insufficient to allow a reasonable juror

---

[5] The statute provided that any person who

knowingly possesses 3 or more books, magazines, periodicals, films,
video tapes, or other matter which contain any visual depiction . . .
which was produced using materials which have been mailed or . . .
shipped or transported [in interstate or foreign commerce], by any
means including by computer, if—

(i) the producing of such visual depiction involves the use of a minor
engaging in sexually explicit conduct; and

(ii) such visual depiction is of such conduct; shall be punished as
provided in subsection (b) of this section.

Wilson, 182 F.3d at 740 (quoting 18 U.S.C. § 2252(a)(4)(B) (1996)) (alterations
in original).

15

to answer the question.

Id. at 743. We also declined to affirm the conviction under the government's

"alternate theory": "that the act of converting a computer graphics file stored on a

diskette into a visual image on a computer monitor could constitute 'production'

of a visual depiction for purposes of the statute." Id. We explained:

> Without foreclosing application of this theory under different
> circumstances, we find it of no value here. As previously noted, the
> stipulated amended superseding indictment narrowly charged
> defendant with violating § 2252(a)(4)(B) by possessing three or more
> computer diskettes that contained visual depictions, i.e., computer
> graphics files. Under § 2252(a)(4)(B), a computer graphics file is
> considered a "visual depiction" as it resides on a computer diskette in
> binary form; no act of viewing the file with software and a monitor is
> necessary. Thus, the focal point of the statute's jurisdictional
> element, as applied to the circumstances of this case, is whether the
> graphics files were produced using materials that traveled in
> interstate commerce. In other words, in determining whether the
> jurisdictional element is satisfied, the statute requires us to focus on
> the graphics files as they reside or are contained on the diskettes, and
> to determine what materials went into producing those files. It is
> irrelevant that defendant may have actually viewed the graphics files,
> using a computer, viewing software, and a monitor, because such
> viewing did not result in production of the graphics files; instead,
> such production necessarily had to have occurred either at or prior to
> the time the graphics files were recorded on the diskettes.

Id. (citation omitted).

The government's argument in the instant case mirrors the government's

"alternate theory" that we rejected in Wilson, and despite the differences in the

statutory texts at issue in the two cases, Wilson still controls here. Section

2252A(a)(5)(B) requires that the "image of child pornography . . . was produced

16

using materials that have been mailed, or shipped or transported in interstate or foreign commerce." Although the statute does not define "image," it defines "child pornography" to mean "any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means . . . ." 18 U.S.C. § 2256(8). The phrase "visual depiction," in turn, "includes undeveloped film and videotape, and data stored on computer disk or by electronic means which is capable of conversion into a visual image." Id. § 2256(5). Thus, under 18 U.S.C. § 2252A(a)(5)(B)—as under § 2252(a)(4)(B) in Wilson—"[i]t is irrelevant that defendant may have actually viewed the graphics files, . . . because such viewing did not result in production of the graphics files; instead, such production necessarily had to have occurred either at or prior to the time the graphics files were recorded on the diskette." Wilson, 182 F.3d at 743.

That is not the end of our analysis, however, because, as we have noted, Schene did not challenge the sufficiency of the evidence below and must therefore establish his entitlement to relief under the plain error standard of review. Under that standard, Schene must establish not only the existence of an error that is clear or obvious under current law, but also that such error affects his substantial rights and seriously affects the fairness, integrity, or public reputation of judicial proceedings. For the reasons that follow, we are not persuaded that Schene can make these latter two showings.

17

Since our decision in <u>Wilson</u>, both the Seventh and Ninth Circuits have addressed the very question that we held was unanswered by the evidence presented in <u>Wilson</u>, i.e., "whether a computer graphics file is produced or created prior to being recorded on a particular storage media, or whether, instead, it only comes into being at or after the point it is recorded on the storage media." 182 F.3d at 743. More specifically, both the Seventh and Ninth Circuits have held, as a matter of law, that computerized images are "produced" for purposes of § 2252A(a)(5)(B) when computer equipment, including both hard drives and computer diskettes, are used to copy or download the images. <u>United States v. Anderson</u>, 280 F.3d 1121, 1125 (7th Cir. 2002); <u>United States v. Guagliardo</u>, 278 F.3d 868, 871 (9th Cir. 2002); <u>United States v. Angle</u>, 234 F.3d 326, 341 (7th Cir. 2000). As the Ninth Circuit explained in <u>Guagliardo</u>, "[w]hen the file containing the image is copied onto a disk" or hard drive, "the original is left intact and a new copy of the image is created, so the process 'produces' an image." 278 F.3d at 871.

Armed with these more recent decisions clarifying how and when a downloaded or copied computer image is "produced," we turn to the evidence presented in Schene's case. It was uncontroverted that all of the charged materials were found on Schene's hard drive. The government introduced the following testimony regarding the movie at issue in Count 1 of the indictment:

Q    Now, the date here created where it's viewed and so on, is that

18

because someone took the file over to Real Player to look at it?

A    Yes.

Q    And that's different from the temporary directory?

A    Correct.

Q    So it would take an intentional act of someone to move that movie over and play it?

A    Yes.

Tr. at 85. The Real Player history, moreover, stated that the movie was "[c]reated" on February 5, 2005. Gov't Ex. 6. While some of this testimony appears to relate to the viewing of the movie, the testimony and government's Exhibit 6 also support the "creation" or downloading of the movie onto the computer hard drive. The image charged in Count 2 was "an active file" that "had been saved to the computer from e-mail coming in." Tr. at 87. Likewise, the images charged in Counts 3 and 4 were "all from e-mail recovered from Jay Schene's computer" and were all "active on the computer." Tr. at 89. The image charged in Count 5 was "recovered from the defendant's computer," "from an e-mail," and was an "active file[]" on the computer. Tr. at 89-90. The government also showed that at least two of the charged images—the images from Exhibits 10 and 13—had appeared on Exhibit 14, the email that outdoorguy sent to himself, and an image sent in this fashion "had to be stored on [Schene's] computer." Tr. at 119.

19

It is obvious that the government's evidence was sufficient, under the more recent Seventh and Ninth Circuit decisions, to show that each "image of child pornography" had been copied or downloaded to Schene's hard drive in one capacity or another, and was therefore "produced using materials that have been mailed, or shipped or transported in interstate or foreign commerce."  18 U.S.C. § 2252A(a)(5)(B); see Anderson, 280 F.3d at 1125; Guagliardo, 278 F.3d at 871; cf. United States v. Lacy, 119 F.3d 742, 750 (9th Cir. 1997) (reviewing for plain error and affirming a conviction under 18 U.S.C. § 2252(a)(4)(B) because the images "were created—'produced'—when Lacy used his computer to download data," and under the statute, "it does not matter that the depictions on Lacy's computer were copies rather than originals").  In light of this conclusion, we would be hard-pressed to say that the claimed insufficiency of the evidence violated Schene's substantial rights or seriously affected the fairness, integrity, or public reputation of his judicial proceedings.  Accordingly, we reject Schene's sufficiency-of-the-evidence challenge to the interstate commerce element of § 2252A(a)(5)(B).

B.    *Sufficiency of the evidence: Schene committing the crime*

Schene next appeals the sufficiency of the evidence that he—and not his wife—committed the offenses.  Schene raised this issue in his Rule 29 motions for judgment of acquittal, and it was the thrust of his defense at trial.

The evidence was sufficient to establish that it was Schene, and not

someone else, who committed the crimes charged. "'Evidence is sufficient to support a conviction if a reasonable jury could find the defendant guilty beyond a reasonable doubt, given the direct and circumstantial evidence, along with reasonable inferences therefrom, taken in a light most favorable to the government.'" United States v. Nelson, 383 F.3d 1227, 1229 (10th Cir. 2004) (quoting United States v. Wilson, 107 F.3d 774, 778 (10th Cir. 1997)). "We will not weigh conflicting evidence or second-guess the fact-finding decisions of the jury." United States v. Summers, 414 F.3d 1287, 1293 (10th Cir. 2005). "Rather than examining the evidence in 'bits and pieces,' we evaluate the sufficiency of the evidence by 'considering the collective inferences to be drawn from the evidence as a whole.'" Nelson, 383 F.3d at 1229 (quoting Wilson, 107 F.3d at 778).

Schene does not contest that the computer contained the charged images of child pornography, or that the only people with access to the computer were Schene and his wife. Government investigators found over 1900 images of child pornography, with images appearing under both of the operating system's user accounts and under two AOL screen names—outdoorguy and ccarlin317. Schene had access to both user accounts, and he admitted to using the screen name ccarlin317.

Also, two of the government's witnesses testified regarding the likelihood of Schene—rather than his wife—viewing the child pornography. One of the

witnesses, Agent Weaver, explained that when the officers first examined Schene's computer, "the images of child pornography started popping up" only after they "switched to show [Schene]'s account." Tr. at 56. From this collection of evidence, a reasonable jury could have found beyond a reasonable doubt that Schene—and not his wife—knowingly possessed the child pornography, and the evidence was sufficient to support Schene's conviction.

C.     *Testimony regarding gender and homosexuality*

Schene next argues that the government erred in admitting testimony regarding the propensity of women to traffic in, and view, child pornography. Specifically, Schene claims that this testimony was unreliable and failed to meet the standards established in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993), Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999), and Rule 702 of the Federal Rules of Evidence. Also, he claims that the government's witnesses violated Rule 704(b) by testifying to the "ultimate issue" of Schene's mental state. Finally, he claims that the government suggested that Schene was a homosexual, which violated his right to due process and a fundamentally fair trial. "'We review challenges to admissibility of evidence solely for abuse of discretion.'" United States v. Chisum, 502 F.3d 1237, 1241 (10th Cir. 2007) (quoting United States v. Reddeck, 22 F.3d 1504, 1508 (10th Cir. 1994)).

22

1. *Agent Weaver's and Officer Elliott's testimony regarding the likelihood of a woman possessing child pornography*

We discern no reversible error in admission of the testimony by Agent Weaver and Officer Elliott about the likelihood of a woman possessing child pornography. Agent Weaver's testimony came on redirect examination after Schene had cross-examined him regarding his failure to investigate Carlin with respect to the images of child pornography. The clear purpose of the questioning on redirect was to explain why Agent Weaver had focused his attention on Schene. For that purpose, it was unnecessary to establish the "scientific" basis for Agent Weaver's testimony. The point was not that the information he received in training was correct; it was that he was acting in accordance with his training.

As for Officer Elliott's testimony, we review for plain error because Schene raised no contemporaneous objection. Under the plain-error standard, we cannot reverse because any error in admitting the testimony was not plain. Officer Elliott's testimony could be justified on the same basis as Agent Weaver's; and it is hardly "plain" that the testimony lacked sufficient support in his training and experience. Moreover, even assuming for purposes of argument that Schene could establish the existence of an error that was plain, we are not persuaded that Schene's substantial rights were violated by the introduction of Officer Elliott's testimony in this regard. In particular, the jury had already heard similar

23

testimony from Agent Weaver, and the other evidence of Schene's guilt was substantial.[6]

### 2. *Alleged violations of Fed. R. Evid. 704(b)*

Schene's second argument—that the government's witnesses violated Rule 704(b) by testifying to the "ultimate issue" of Schene's mental state—was not raised before the district court and is largely incomprehensible in Schene's appellate brief. There is no indication in the trial transcript that the government's witnesses violated Rule 704(b).

### 3. *Alleged references to homosexuality*

Schene also claims that the government suggested that he was a homosexual, which violated his right to due process and a fundamentally fair trial. "When prosecutorial misconduct deprives a criminal defendant of a fair trial, the defendant's due process rights are violated, and reversal is warranted." United States v. Gabaldon, 91 F.3d 91, 93 (10th Cir. 1996) (citations omitted). As we have explained previously, a prosecutor's emphasis on a defendant's homosexuality can have "a tremendous negative impact on jurors" and is often "designed solely to inflame the jury's prejudices." Neill v. Gibson, 263 F.3d 1184, 1201-02 (10th Cir. 2001) (citing cases). If a defendant "has both objected

---

[6] We emphasize that Schene opened the door to this testimony and we stress that our holding on this point is very limited, and should not be interpreted as *carte blanche* to introduce this type of evidence in every case involving child pornography.

contemporaneously and unsuccessfully moved the district court for a mistrial" based on alleged prosecutorial misconduct, the appropriate standard of review is for "an abuse of discretion." Gabaldon, 91 F.3d at 93.

The government made two references to homosexuality during Schene's trial. The first was Officer Elliott's description of the type of child pornography found on Schene's computer:

> A     I would say probably 90 to 95 percent of the images that were child pornography were images of young boys. They may be nude by themselves in a sexually provocative position, they may be engaged in a homosexual act with another young boy or an adult male.
>
> Q     And in your experience in working with cyber crimes and these types of investigations, have you ever seen a woman who trafficked in child pornography showing homosexual acts between males?
>
> A     I have not.

Tr. at 107. Contrary to Schene's contention, the government did not accuse him of being a homosexual in this testimony, or suggest that homosexuals are more likely to view child pornography. The government's use of the word "homosexual" was solely to describe the type of child pornography found on Schene's computer.

The second reference to homosexuality, however, is more problematic. Officer Elliott testified:

> Q     Now, on the internet history, were there instances you could find where websites with homosexual themes had been visited?

25

A      Yes, sir. I saw repeatedly, I saw the user under the Jay Martin Schene account visit www.menforsexnow.com, www.menforrentnow.com, www.cruisingforsex.com. And there was an address at library.gaycafe.com that was visited very frequently.

Q      And did you look at a few of these websites?

A      I did. I visited each of those. Each of them are gay oriented for males. They all offered child pornography to view. They are kind of a social networking site where you can post your profile or post an ad requesting to meet with someone and that kind of thing.

Tr. at 126. The prosecutor's initial question in this exchange was arguably improper. See Neill, 263 F.3d at 1201-02.

Nevertheless—and even assuming, *arguendo*, that Schene preserved this argument for appeal by objecting and moving for a mistrial on this ground earlier in the trial—the district court did not abuse its discretion in failing to grant a mistrial based on the prosecutorial misconduct. The prosecutor's question was "singular and isolated," United States v. Ivy, 83 F.3d 1266, 1288 (10th Cir. 1996) (citation and internal quotation marks omitted), and Officer Elliott quickly re-focused his testimony on the fact that the websites "all offered child pornography to view." Tr. at 126. Given the evidence against Schene, moreover, the alleged prosecutorial misconduct was not "flagrant enough to influence the jury to convict on grounds other than the evidence presented." Ivy, 83 F.3d at 1288 (citations and internal quotation marks omitted). Reversal is not warranted on these grounds.

D.   *Allegedly irrelevant and prejudicial evidence*

Lastly, Schene challenges the district court's decision to admit Exhibits 5, 6, 7, 8, 9, 10, 11, and 14.  He argues that, given his willingness to stipulate that the images were child pornography, any images were irrelevant and unfairly prejudicial under Rules 402 and 403 of the Federal Rules of Evidence.  Schene also contends that Exhibits 8, 9, and 14—i.e., the exhibits containing images not linked to a specific count in the indictment—were admitted in violation of Rule 404(b), as was the Real Player history in Exhibit 6.[7]

Our review of the district court's decision to admit evidence is for an abuse of discretion.  Chisum, 502 F.3d at 1241.  Under Rule 403 of the Federal Rules of Evidence, otherwise relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Fed. R. Evid. 403.  In addition, Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts . . . [may be] admissible
> for other purposes, such as proof of motive, opportunity, intent,
> preparation, plan, knowledge, identity, or absence of mistake or
> accident, provided that upon request by the accused, the prosecution
> in a criminal case shall provide reasonable notice in advance of trial,

---

[7] Schene also mentions Exhibit 12 in passing, but he does not explain how this piece of evidence would violate Rule 402, 403, or 404(b).  Exhibit 12 is AOL's disclosure of the identity of butwhoishe and handsomehorn, and the district court did not abuse its discretion in admitting it into evidence.  We will not address Exhibit 12 in additional detail.

or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Fed. R. Evid. 404(b). Evidence is admissible under Rule 404(b) if the following factors are satisfied: "(1) the evidence must be offered for a proper purpose; (2) it must be relevant; (3) its probative value must not be substantially outweighed by its potential for unfair prejudice under Rule 403; and (4) the court must give a proper limiting instruction, if it is requested by the defendant." United States v. Moran, 503 F.3d at 1135, 1143-44 (10th Cir. 2007) (citing Huddleston v. United States, 485 U.S. 681, 691-92 (1988)).

The district court did not abuse its discretion in admitting the exhibits that Schene challenges on appeal. In United States v. Campos, 221 F.3d 1143, 1148 (10th Cir. 2000), we rejected a defendant's argument that, under Rule 403, and "in light of his offer to stipulate that those images constituted child pornography, there was no reason to show them to the jury and to do so was unduly prejudicial." We explained that, in contrast to the evidence at issue in Old Chief v. United States, 519 U.S. 172 (1997), the offer to stipulate in Campos involved "the gist of the government's current case against [the defendant]—the two pornographic images that he allegedly transported via computer." Campos, 221 F.3d at 1149. Likewise, in the instant case, the images charged in the indictment—and admitted as evidence in Exhibits 5, 7, 10, 11, and 13—were the gist of the government's current case against Schene. The government was

28

entitled to prove its case, and given the charges against Schene, those images were not unfairly prejudicial under Rule 403. See Old Chief, 519 U.S. at 186-87 (explaining that it is "unquestionably true as a general matter," that "the prosecution is entitled to prove its case by evidence of its own choice, or, more exactly, that a criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it").[8]

The uncharged images in Exhibits 8, 9, and 14 are a closer call, but the district court did not abuse its discretion in admitting them into evidence. Exhibits 8 and 9 were emails containing images of child pornography, sent from outdoorguy to butwhoishe within minutes of other emails from butwhoishe to outdoorguy. Exhibit 14 was an email containing seventy-six images of child pornography that outdoorguy sent to himself. The government introduced these emails to show intent and knowledge under Rule 404(b), and the district court gave a limiting instruction on the matter. See Tr. at 88 ("Ladies and gentlemen, to the extent that this evidence relates to anything other than the specific files that are charged in the indictment, I would instruct you that it's to be considered only as it bears on the defendant's knowledge or intent, and you should consider it only for that limited purpose."). Under 18 U.S.C. § 2252A(a)(5)(B), the government had to prove that Schene "knowingly possess[ed]" the images of child

_____

[8] In his Reply Brief, Schene concedes that, under Campos, the images charged in the indictment were appropriately admitted into evidence.

29

pornography, and the district court did not abuse its discretion under Rules 403 and 404(b) in admitting these uncharged images for this limited purpose. See United States v. Simpson, 152 F.3d 1241, 1249 (10th Cir. 1998) (affirming the district court's decision to admit similar evidence "to prove that (1) [the defendant's] possession of child pornography on his computer was not a mistake or accident, and (2) he had knowledge of the nature of the material he was receiving").

Likewise, the district court did not abuse its discretion in admitting Exhibit 6 into evidence. Exhibit 6—the Real Player history pertaining to the video charged in Count 1—was introduced to show knowledge and intent, and the district court gave a limiting instruction on the matter. See Tr. at 84 (explaining that "the evidence comes in only as it bears or as it suggests intent or knowledge on behalf of the defendant, and you should consider it only for that limited purpose"). Exhibit 6 was not unfairly prejudicial under Rule 403. It was a limited segment of the much broader Real Player history, and it pertained directly to Schene's knowing and intentional playing of the video charged in Count 1. The district court did not abuse its discretion.[9]

AFFIRMED.

---

[9] For many of the same reasons discussed above, we reject Schene's relevance arguments under Rules 401 and 402 as to all of the exhibits being appealed, and we will not address them in detail. See Old Chief, 519 U.S. at 178-79.