FILED
United States Court of Appeals
Tenth Circuit

February 24, 2012

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

v.

KENNETH DEAN STURM,

        Defendant - Appellant.

No. 09-1386

---

**ON REHEARING EN BANC FROM AN APPEAL
FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. NO. 1:06-CR-00342-LTB-1)**

---

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

v.

CHRISTOPHER ADAM DAYTON,

        Defendant - Appellant.

No. 09-5022

---

**ON REHEARING EN BANC FROM AN APPEAL
FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
(D.C. NO. 4:07-CR-00076-TCK-1)**

---

Kathleen A. Lord, Assistant Federal Public Defender (Raymond P. Moore, Federal Public Defender, with her on the briefs), Denver, Colorado, for Appellant Sturm.

Michael G. McGuire, Attorney at Law, Tulsa, Oklahoma, for Appellant Dayton.

Judith A. Smith, Assistant United States Attorney, Denver, Colorado (John F. Walsh, United States Attorney, District of Colorado, Denver, Colorado; Thomas Scott Woodward, United States Attorney, Northern District of Oklahoma and Leena Alam, Assistant United States Attorney, Tulsa, Oklahoma, with her on the briefs), for Appellee United States of America.

Before **BRISCOE**, Chief, Judge, **HOLLOWAY**, **BALDOCK**, **KELLY**, **LUCERO**, **MURPHY**, **HARTZ**, **O'BRIEN**, **TYMKOVICH**, **GORSUCH**, **HOLMES**, and **MATHESON**, Circuit Judges.

**MURPHY**, Circuit Judge.

## I.    Introduction

Appellant Christopher Adam Dayton was convicted of distributing and possessing child pornography, in violation of 18 U.S.C. § 2252(a)(2) and (a)(4)(B).  Appellant Kenneth Dean Sturm was convicted of receiving and possessing child pornography, in violation of 18 U.S.C. § 2252A(a)(2)(B) and (a)(5)(B).  Both Defendants argue the Government cannot prove the interstate commerce element of the crimes charged unless it presents evidence the specific digital images they possessed, received, and/or distributed traveled in interstate or foreign commerce.  We conclude to the contrary: the Government may satisfy the jurisdictional element of each of the statutes at issue if it presents evidence that

the substantive content of the images has, at some point, traveled in interstate or foreign commerce.

## II. Factual Background

### A. Appellant Dayton

The criminal charges against Dayton stemmed from an investigation initiated by FBI Special Agent Joseph Cecchini. By conducting a keyword search on LimeWire, a peer-to-peer file sharing program, and entering a search term commonly associated with child pornography, Cecchini located files containing the term on the computer of a LimeWire user who had been assigned the IP address 68.12.237.195. Cecchini downloaded four complete or partial video files from the 323 files available on the shared folder of this LimeWire user.[1]

Cecchini subpoenaed Cox Communications, the Internet service provider that had assigned the 68.12.237.195 IP address to one of its subscribers. In response to the subpoena, Cox provided the subscriber's personal information and investigators obtained a search warrant for a physical address in Tulsa, Oklahoma. When officers executed the warrant on the morning of April 18, 2007, Dayton answered the door. While other officers conducted the search, Cecchini and a second officer interviewed Dayton inside the residence. Dayton admitted

---

[1]Agent Cecchini testified that the FBI runs a specially engineered version of LimeWire that permits investigators to download a file from just one identifiable IP address instead of downloading portions of the complete file from many different shared folders.

subscribing to the Cox Communications account. He also admitted using LimeWire to download child pornography and maintaining a shared folder visible to other LimeWire users containing, among other things, images and videos of child pornography. During the interview, Dayton wrote out the following statement: "[A]bout 3-4 months ago I started to use limewire and axedentle [sic] saw child porn and started to download it. I hated myself for it and deleted it. But I download[ed] it agen [sic] and I'm sorry. And burned it to 3 cds."

During the search of Dayton's home, officers seized computer hard drives and 169 compact disks. Based on the content of the seized materials, Dayton was charged in a two-count indictment with violating 18 U.S.C. § 2252(a)(2) and § 2252(a)(4)(B). Specifically, the indictment charged Dayton

> did knowingly distribute and attempt to distribute visual depictions of minors engaging in sexually explicit conduct, as that term is defined in Title 18, United States Code, Section 2256(2)(A)(i-v), to wit: video files, including but not limited to a filed named [ ].mpg, each of which video files had been shipped and transported in interstate or foreign commerce, the producing of each of which video files involved the use of minors engaging in sexually explicit conduct, and each of which video files were of such conduct, in violation of Title 18, United States Code, Section 2252(a)(2).

and

> knowingly possessed and attempted to possess visual depictions of minors engaging in sexually explicit conduct, as that term is defined in Title 18, United States Code, Section 2256(2)(A)(i-v), to wit: video files and graphic image files, including but not limited to a file named [ ].mpg, each of which files had been transported in interstate or foreign commerce by computer, the producing of each of which files involved the use of minors engaging in sexually explicit

-4-

conduct, and each of which files were of such sexually explicit conduct, in violation of Title 18, United States Code, Section 2252(a)(4)(B).

Before trial, Dayton moved to dismiss the indictment for failure to establish the interstate nexus element of the statute. Specifically, he argued Cox Communications's server was located wholly within the state of Oklahoma and all the visual depictions of children engaging in sexually explicit conduct he acquired or distributed using his account with Cox were routed only through that server. The district court took Dayton's motion under advisement until the close of the Government's trial evidence.

At trial, the prosecution played the four video files Cecchini downloaded from Dayton's LimeWire shared folder while Cecchini described to the jury the acts of child sexual abuse portrayed in the videos. A Tulsa pediatrician opined that the children in images found on Dayton's computer were minors and testified a child in one of the videos was much younger than twelve and "could easily be under eight." Relevant to the question of the interstate movement of the visual depictions possessed by Dayton, Cecchini testified he had seen all four videos before and FBI investigators had previously downloaded them from foreign countries and from "every state but two." Cecchini also testified the child in one of the videos is from Richland, Washington. On cross-examination, Cecchini reiterated he used LimeWire to download the files directly from a shared folder

-5-

on Dayton's computer.[2]  Cecchini restated that the FBI had downloaded the same files from users with IP addresses in other states but admitted there was no way for him to tell where or how Dayton obtained the specific files discovered on his hard drive and on the compact disks seized from his home because logs or records of that activity do not exist.  Cecchini also testified that both his office and Dayton's home are located in the state of Oklahoma.  In response to a question from the court at the end of re-cross, Cecchini testified that a LimeWire user like Dayton who makes files on his shared folder available for download by other LimeWire users, cannot limit access to the shared folder based on the geographical location of the other LimeWire users.

The Government also presented the testimony of Christopher Trifiletti, an FBI Special Agent who specializes in the identification of victims of internet crimes against children.  Agent Trifiletti testified he had traveled to Paraguay as part of an investigation into the identity of minor children whose images had been posted to Internet news groups in the United States.  The individual who photographed the children and originally posted them on the Internet for profit was identified as a Paraguayan named Milton Xischatti Michel.  While in Paraguay, Trifiletti interviewed victims and their parents, ultimately confirming the identity of fifteen Paraguayan children.  Paraguayan national identity cards or

---

[2]Dayton told investigators he had used LimeWire to download the files he saved to his shared folder and had burned some of the files onto compact disks.

-6-

birth certificates established the ages of the children as between nine and thirteen years. Agent Trifiletti specifically identified the children in three of the images seized from Dayton's home as three children he met and interviewed while he was in Paraguay. He also confirmed that the photographs were taken in Paraguay and none of the children in the images have ever left Paraguay. Trifiletti further testified that one child was ten years old at the time her photograph was taken and the other two children were twelve.

At the close of the Government's case, Dayton renewed his motion to dismiss the indictment, arguing the Government failed to produce sufficient evidence to satisfy the interstate commerce element of 18 U.S.C. § 2252(a)(2) and (a)(4)(B). Relying on dicta in *United States v. Schaefer*, 501 F.3d 1197, 1206 (10th Cir. 2007), Dayton argued the Government's evidence did not establish exactly how the digital files came into his possession and failed to establish that the digital files Agent Cecchini downloaded from his LimeWire shared folder traveled in interstate commerce when they moved from his computer in Oklahoma to the FBI computer which was also in Oklahoma. The district court denied Dayton's motion as to seven images, concluding the Government met its burden by presenting evidence the images were created outside the state of Oklahoma and, thus, at some point traveled in interstate commerce.

The jury found Dayton guilty on both counts charged in the indictment. The district court sentenced him to a sixty-three month term of incarceration.

Dayton appealed his convictions, arguing the Government failed to meet its burden of proving the jurisdictional element of the charged offenses. A divided panel of this court agreed with Dayton, concluding the Government was required, but failed, to present evidence that the particular images seized during the search of Dayton's home crossed state lines when they moved from Dayton's LimeWire shared folder to Agent Cecchini's computer or when they were downloaded by Dayton and saved to his computer hard drive or a compact disk. *United States v. Dayton*, 426 F. App'x 582, 598-99 (10th Cir. 2011), vacated, *United States v. Sturm*, Nos. 09-1386, -5022, 2011 WL 6261657 (10th Cir. Apr. 4, 2011) (en banc). This court *sua sponte* granted rehearing en banc and vacated the panel decision. *Sturm*, 2011 WL 6261657, at *1.

### B.  *Appellant Sturm*

The charges against Appellant Sturm arose from an investigation initiated by United States Immigration and Customs Enforcement (ICE). An ICE investigator gained access to an Internet website containing images of child pornography by purchasing a twenty-day subscription for $79.99. After the investigator received an email from a Hotmail account which confirmed his subscription and contained links to the website, he obtained authorization to intercept communications from this Hotmail account. One of those communications permitted the investigator to view the order information for a subscriber who had chosen the login name, Searcher1960, and the password,

deanos. This subscriber gave the email address dean30502@aol.com, the first name Kenneth, and the last name Sturm. He also provided his street address and credit card information. After reviewing information obtained from America Online (AOL), an ICE investigator confirmed the subscriber using the AOL account associated with the email address dean30502@aol.com was Appellant Sturm.

On August 10, 2006, agents executed a search warrant for Sturm's residence in Colorado. No computers were located during the course of that search but agents later determined that two computers from Sturm's residence were in the possession of the Rocky Mountain Regional Forensic Laboratory. Sturm had surrendered them to his probation officer on May 5th, 2006,[3] and they were subsequently seized by law enforcement after Sturm's probation officer detected what appeared to be an image of child pornography on one of the hard drives. A duplicate copy of the hard drive was created and sent to ICE Special Agent Patrick Redling for forensic testing. Agent Redling found nineteen images of child pornography in a file designated as thumbs.db. The location of these images on Sturm's hard drive indicated he had previously saved full-size versions to a folder on his hard drive named "My Pictures." A folder in Sturm's temporary

---

[3]The monitoring of Sturm's computers by the probation officer stemmed from Sturm's 2003 Ohio conviction for pandering sexually oriented matter involving a minor.

Internet cache and unallocated space on his hard drive contained more than 180 additional images of child pornography.

Sturm was charged with violating 18 U.S.C. § 2252A(a)(5)(B) by "knowingly and unlawfully possess[ing] material that contained an image of child pornography, as defined in Title 18, United States Code, Section 2256(8)(A), that had been mailed, shipped and transported in interstate and foreign commerce by any means, including by computer." The indictment referenced Sturm's hard drive model and serial number and specifically identified three images contained thereon as "digital images of child pornography." In a second count, Sturm was charged with violating 18 U.S.C. § 2252A(a)(2)(B) by "knowingly and unlawfully receiv[ing] material that contained one or more images of child pornography, as defined in Title 18, United States Code, Section 2252(8)(A), that had been mailed, shipped and transported in interstate and foreign commerce by any means, including by computer."

Trial evidence relevant to the jurisdictional element of the crimes charged included Agent Redling's testimony that his analysis of Sturm's hard drive showed that the images charged in Count One of the indictment were purposefully saved to the hard drive as the user viewed web pages on the Internet. There was additional testimony that Sturm accessed the Internet exclusively through AOL. The Director of Investigations and Global Security for AOL testified that Sturm created an AOL account on September 20, 2004, with the primary screen name of

deano30502.  This witness also testified that any Internet search performed by an AOL subscriber in Colorado necessarily involves data transmissions routed to Colorado through servers located in either California or Virginia.

The parties proffered two different jury instructions on the interstate commerce element.  At the final jury instruction conference, the district court agreed to give the instruction proposed by the Government with the addition of a sentence requested by Sturm.  With that addition, the jury was instructed as follows on the jurisdictional element:

> The phrase "transported in interstate commerce" means that the visual depiction, at any time, traveled or moved between any place in a state and any place outside of that state, or from any place in one country and any place outside of that country.  Thus, any time an object moves or travels across state lines or moves or travels from one State to another State, or from one country to another country, it has traveled in interstate commerce.
>
> Although the Government must prove beyond a reasonable doubt that visual depictions were transported in interstate or foreign commerce, it is not necessary for the Government to establish that the defendant knew that state lines were actually being crossed or that the image traveled in interstate or foreign commerce.
>
> To prove that a specific image has been transported in interstate or foreign commerce, it is not enough for the Government to prove only that the image was viewed from the Internet.

The jury found Sturm guilty of both offenses charged in the indictment. The district court sentenced him to concurrent terms of 120 months' imprisonment on Count One and 180 months' imprisonment on Count Two.  He was also sentenced to a twenty-year term of supervised release.  After sentencing,

Sturm filed this direct appeal challenging, among other things, the jury instruction on the interstate commerce element.[4]  A panel of this court unanimously rejected Sturm's argument that the jury was improperly instructed because the Government was required to prove that the specific digital files found on his computer traveled in interstate commerce.  *United States v. Sturm*, 425 F. App'x 666, 673-74 (10th Cir. 2011), vacated, Nos. 09-1386, -5022, 2011 WL 6261657 (10th Cir. April 4, 2011) (en banc).  The panel opinion was vacated when the en banc court *sua sponte* granted rehearing.  *Sturm*, 2011 WL 6261657, at *1.

## III. Discussion

### A. Standard of Review

We review de novo Dayton's challenge to the sufficiency of the evidence. *United States v. Cooper*, 654 F.3d 1104, 1115 (10th Cir. 2011).  Sturm's challenge to the jury instruction is likewise reviewed do novo because it is premised on an argument the instruction failed to accurately inform the jury of the correct law.  *Jones v. United Parcel Service, Inc.*, No. 09-3275, 2011 WL 5027642, at *7 (10th Cir. Oct. 24, 2011).  To the extent our review implicates questions of statutory interpretation, those are also reviewed de novo.  *United States v. Yeley-Davis*, 632 F.3d 673, 681 (10th Cir. 2011).

---

[4]Sturm did not challenge the sufficiency of the evidence the Government presented to show the jurisdictional element.  He stipulated that the images underlying both counts involved minor children and depicted acts that took place outside the state of Colorado.

*B.     Visual Depiction*

Dayton was convicted of distributing visual depictions of minors engaging in sexually explicit conduct, in violation of 18 U.S.C. § 2252(a)(2), and possessing visual depictions of minors engaged in sexually explicit conduct, in violation of 18 U.S.C. § 2252(a)(4)(B).  At the time Dayton was charged, the Government was required to prove the visual depictions had been mailed, shipped, or transported in interstate or foreign commerce.  18 U.S.C. § 2252(a)(2), (a)(4)(B) (2006).  Sturm was convicted of receiving child pornography, in violation of 18 U.S.C. § 2252A(a)(2)(B), and possessing child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B).  At the time Sturm was charged, the term child pornography was defined, in relevant part, as "any visual depiction, including any photography, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where—(A) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct."  18 U.S.C. § 2256(8) (2006).[5]  To convict Sturm, the

_____

[5]Our analysis is limited to the version of the statute in effect at the time of the Defendants' conduct.  Sturm's crimes were committed between January 1, 2005, and May 5, 2006; Dayton's crimes were committed on March 30, 2007.  We focus on the version of the statutes in effect between April 30, 2003, and October 8, 2008, including amendments made in 2006 by the Adam Walsh Child Protection and Safety Act ("AWCPSA").  *See* Pub. L. No. 109-248, 120 Stat. 587, 614, 648-649 (July 27, 2006).  The changes set out in the AWCPSA do not affect
(continued...)

-13-

Government was required to prove the child pornography had "been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer." 18 U.S.C. § 2252A(a)(2)(B), (5)(B) (2006).

The challenges raised by both Dayton and Sturm implicate the Government's burden of proving the interstate commerce element of the crimes charged. Dayton argues each copy of an image depicting minors engaged in sexually explicit conduct is a separate and distinct visual depiction and the Government presented insufficient evidence that the specific digital files he was convicted of possessing and distributing traveled in interstate or foreign commerce. Sturm similarly argues the Government was required to prove the specific digital files he was convicted of receiving and possessing traveled in interstate or foreign commerce and the instruction given by the district court permitted the jury to convict him without so finding. The Government counters that it can meet its burden by proving that the substance of such digital files—the particular portrayal of a minor engaging in sexually explicit conduct—traveled in interstate or foreign commerce in some form at some point in time. The parties, thus, disagree over whether a specific digital transmission or specific physical object, or merely the substantive content of that transmission or object, must cross state lines. Because child pornography is defined by reference to the definition of

_____

[5](...continued)
the issue raised by Sturm that is currently before this court.

-14-

visual depiction, the resolution of Sturm's challenge to the jury instruction, like

Dayton's challenge to the sufficiency of the evidence, hinges on the meaning of

the term "visual depiction."[6] We begin our analysis of the parties' competing

arguments by examining the language of the applicable statutes, interpreting that

---

[6]The parties were ordered to file supplemental briefs addressing the following question:

> Whether the jurisdictional element of 18 U.S.C. §§ 2252 and 2252A requires proof that the particular image of child pornography that is the identified object of the defendant's statutorily proscribed possession, receipt, or distribution traveled in interstate or foreign commerce, or whether it is sufficient to establish the jurisdictional element to show that the original or some other iteration of that image traveled in interstate or foreign commerce at some point prior to the defendant's alleged commission of the charged crime? In other words, does the term "visual depiction," as employed in 18 U.S.C. §§ 2252 and 2252A, refer specifically to the particular image possessed, received, or distributed by the defendant, or does it instead refer to the substance of an image of child pornography and thereby encompass not only the particular image possessed, received, or distributed by the defendant, but also any prior generations of that image, including the original?

*United States v. Sturm*, Nos. 09-1386, -5022, 2011 WL 6261657, at *1 (10th Cir. April 4, 2011) (en banc). It is immaterial for purposes of our statutory analysis that the indictment charged Dayton with possessing "files" that "had been shipped and transported in interstate or foreign commerce as opposed to "visual depictions" that had been so transported. Under well-settled principles, the indictment clearly gave Dayton fair notice of the charges against him and he does not argue otherwise. *United States v. Gama-Bastidas*, 222 F.3d 779, 785 (10th Cir. 2000) ("An indictment is sufficient if it sets forth the elements of the offense charged, puts the defendant on fair notice of the charges against which he must defend, and enables the defendant to assert a double jeopardy defense." (quotation omitted)). The use of the term "files" in the indictment neither narrows the scope of the statute Dayton was charged with violating nor informs the statutory question currently before this court.

-15-

language "in light of the purposes Congress sought to serve." *Been v. O.K. Indus.*, 495 F.3d 1217, 1227 (10th Cir. 2007) (quotation omitted).

As amended by The Child Pornography Prevention Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009, 3009-26 to -28 (Sept. 30, 1996), visual depiction was defined in the relevant version of the statute to include "data stored on computer disk or by electronic means which is capable of conversion into a visual image" as well as "undeveloped film and videotape." 18 U.S.C. § 2256(5) (2006). Because the definition is non-exhaustive and could be construed in a way that is consistent with either of the two positions advanced here, we must look to other provisions of the statutes to discern its meaning. We first look to the statutes Dayton and Sturm were charged with violating.

Defendant Dayton was convicted of violating 18 U.S.C. § 2252(a)(2) which makes it a crime to, *inter alia*, knowingly distribute or receive any visual depiction when "the *producing of such visual depiction* involves *the use of* a minor engaging in sexually explicit conduct; and such visual depiction is of such conduct." (emphasis added). Under the approach advocated by Defendants, this provision of § 2252(a)(2) would not extend to conduct involving the receipt or distribution of any image other than the original image. Even though the substantive content of a copy would be identical to that of the original, under Defendants' interpretation of the term visual depiction, distribution of the copy would not be covered by the statute because only the *production* of the original

-16-

involved "the use of a minor engaging in sexually explicit conduct." This is contrary to the express language of § 2252 which also criminalizes the knowing *reproduction* of "any visual depiction for distribution in interstate or foreign commerce" if the "producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and such visual depiction is of such conduct." 18 U.S.C. § 2252(a)(2) (2006). This language was added when the statute was amended by the Child Protection Act of 1984, Pub. L. No. 98-292, 98 Stat. 204, 204 (May 21, 1984). The stated purpose of the amendment was to "close[ ] a loophole which has required proof that the producers of child pornography actually use the child depicted in the production of the material" and to "make prosecution of those who make or produce child pornography easier by applying the offense to those who merely reproduce such materials for distribution." H.R. Rep. No. 98-536 (1983), *reprinted in*, 1984 U.S.C.C.A.N. 492, 498. Further, when the Protection of Children Against Sexual Exploitation Act of 1977 was originally enacted, the Senate expressed its concern that images of child pornography can be quickly and cheaply reproduced:

> It should also be remembered that in reproducing [child pornography] thousands of copies can be made from a single negative. As a result, the cost[s] of producing child pornography are minimal but the profits are often enormous. . . . [A] cheap home movie camera can be used to produce a film that will sell thousands of copies for $75 to $200 each.

S. Rep. No. 95-438, at 4 (1977), *reprinted in*, 1978 U.S.C.C.A.N. 40, 44.  Thus, it is clear Congress intended to criminalize the receipt and distribution of copies, prosecution of which would be foreclosed under Defendant's reading of the term visual depiction.  Thus, Defendants' position is not consistent with the plain language of § 2252 or congressional intent.

Defendant Sturm was convicted of violating 18 U.S.C. § 2252A(a)(2) which criminalizes, in part, the knowing distribution or receipt of child pornography, defined to include visual depictions of sexually explicit conduct, *the production of which*, "involves the use of a minor engaging in sexually explicit conduct."  18 U.S.C. § 2256(8)(A) (2006).  As we have already concluded, *supra*, under Defendants' interpretation of the term visual depiction this provision effectively criminalizes only the distribution or receipt of the original image.  Section 2256(8), however, also defines child pornography to include digital or computer-generated images "that [are], or [are] indistinguishable from, that of a minor engaging in sexually explicit conduct" and images created to "appear that an identifiable minor is engaging in sexually explicit conduct."  *Id*. § 2256(8)(B), (C).  Even under Defendants' illogically narrow interpretation of the term visual

depiction, § 2256(8)(B) and (C)[7] extend the reach of § 2252A to the receipt and distribution of copies.

Under the doctrine of *in pari materia*, however, this court should not consider § 2256(8)(B) and (C) in isolation from § 2256(8)(A). We must, instead, construe the term visual depiction in a way that gives full effect to all the subparts of the statute. Likewise, § 2252 and § 2252A should also be construed *in pari materia* because both statutory provisions criminalize similar conduct. The term visual depiction, thus, must have the same meaning under both sections and that meaning must be consistent with the overall statutory scheme. Like § 2252(a)(2), § 2252A(3)(A) expressly criminalizes the reproduction of child pornography. 18 U.S.C. § 2252A(3)(A). Further, when Congress enacted the PROTECT Act, which made amendments to § 2252A and § 2256, including the addition of § 2252A(3)(A), it found that "[c]hild pornography circulating on the Internet has, by definition, been digitally uploaded or scanned into computers and has been transferred over the Internet, often in different file formats, from trafficker to trafficker. An image seized from a collector of child pornography is

---

[7]These two provisions are supported by congressional findings underpinning the PROTECT Act. Pub. L. No. 108-21, 117 Stat. 650, 676-78 (April 30, 2003). Congress found "[t]here is no evidence that the future development of easy and inexpensive means of computer generating realistic images of children would stop or even reduce the sexual abuse of real children or the practice of visually recording that abuse." 117 Stat. 650, 678. Congress expressed its concern that the failure to criminalize the possession of computer-generated child pornography would "threaten[] to render child pornography laws that protect real children unenforceable." *Id.*

rarely a first-generation product . . . ." Pub. L. No. 108-21, 117 Stat. 650, 677 (April 30, 2003). The findings also reference original images that have "been scanned from a paper version into a digital format" (*i.e.*, a copy). 117 Stat. 650, 677. Most importantly, Congress believed the amendments were necessary to prevent the "de facto legalization of the possession, receipt, and distribution of child pornography for all except the original producers of the material." 117 Stat. 650, 678. These findings highlight that Congress intended § 2252A, like § 2252, to encompass the possession, receipt, and distribution of digitized *copies* of original images because of the harmful effects of the *content*.

Under the Government's interpretation of the term visual depiction, § 2252, § 2252A, and § 2256(8) are wholly logical and criminalize all the conduct Congress clearly intended to criminalize. The same is not true under the Defendants' interpretation. Thus, we construe the term visual depiction to mean the substantive content of an image depicting a minor engaging in sexually explicit conduct.

Our conclusion is bolstered by the consequence that some statutory provisions lose their commonsense meaning under Defendants' approach. For example, the crimes enumerated in § 2252(a) focus on visual depictions involving a minor engaging in sexually explicit conduct if the "visual depiction *is of such conduct*." 18 U.S.C. § 2252(a)(1)(B), (2)(B), (3)(B)(ii), (4)(B)(ii) (emphasis added). Only the substance of an image can be "of such conduct." Likewise, 18

-20-

U.S.C. § 2252A(a)(3), which criminalizes, *inter alia*, the distribution of "materials" that *contain* "an obscene visual depiction of a minor engaging in sexually explicit conduct," makes little sense unless the term visual depiction means the substantive content of the image. The flaw in Defendants' position is further illuminated by examining similar language in 18 U.S.C. § 2252(a)(4)(B). Dayton was convicted of violating this statute, which criminalizes the possession of "1 or more books, magazines, periodicals, films, video tapes, or other matter which *contain* any visual depiction that has been mailed, or has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 2252(a)(4)(B) (emphasis added). If, as Defendants argue, the term visual depiction means the specific iteration of the image rather than its substance, the use of the phrase "matter which contain any visual depiction" in § 2252(a)(4)(B) is unnecessary and redundant because Defendants' definition effectively rewrites the statute to say, "matter which contains any matter."

Section 2252(a)(4)(B) also clearly states it is the visual depiction, not the particular form of the visual depiction, that must travel in interstate or foreign commerce. Defendants attempt to rewrite the statute to criminalize the possession of any matter containing a visual depiction if that *matter* has been mailed, shipped, or transported in interstate commerce. But that is not what the statute says. It expressly criminalizes the possession of any "*visual depiction* that has been mailed, or has been shipped or transported in interstate or foreign

-21-

commerce." *Id*. (emphasis added). And, as we have already concluded,

Congress intended visual depiction to mean substantive content.

Defendants argue our interpretation of the statute is misadvised because it

would effectively eliminate the affirmative defense contained in 18 U.S.C.

§ 2252(c)."[8] That defense may be invoked by defendants charged with violating

18 U.S.C. § 2252(a)(4) who

> (1) possessed less than three matters containing any visual depiction proscribed by [18 U.S.C. § 2252(a)(4)]; and
>
> (2) promptly and in good faith, and without retaining or allowing any person, other than a law enforcement agency, to access any visual depiction or copy thereof—
>
>> (A) took reasonable steps to destroy each such visual depiction; or
>>
>> (B) reported the matter to a law enforcement agency and afforded that agency access to each such visual depiction.

18 U.S.C. § 2252(c). Defendants argue this defense would not be available to

"low-level possessors" because they do not have access to the original and all

copies of the visual depiction and, thus, would be unable to destroy them or

provide law enforcement with access to them as required by the statute.

Defendants' argument, however, is an overstatement because the statute only

requires a defendant to take "reasonable steps" to destroy the visual depictions.

Further, the term visual depiction is modified by the word "such," which is a

---

[8]There is an identical affirmative defense available to defendants charged with violating 18 U.S.C. § 2252A(2)(5). 18 U.S.C. § 2252A(d).

reference to the visual depictions possessed by the defendant. Thus, a defendant would qualify for the affirmative defense if he reasonably attempts to destroy the one or two visual depictions he is alleged to possess. Our interpretation of the statute, therefore, is consistent with the affirmative defense.

## IV. Conclusion

After examining the statute as a whole with reference to the legislative history, we conclude the term visual depiction means the substantive content of an image depicting a minor engaging in sexually explicit conduct rather than the specific medium or transmission used to view, store, receive, or distribute that content. A visual depiction is created once—when the child sexual abuse is captured on some type of media; it is not created anew each time that substantive content is transferred to a different storage device or transmitted over the Internet. All copies of the same substantive content are the same visual depiction. Thus, a visual depiction can be contained both in the particular tangible or digital media possessed, received, or distributed by a defendant and also in any other form or copy of the image, including the original. Further, under the plain language of the statute, the Government is only required to prove that the visual depiction "has been" mailed, shipped, or transported in interstate or foreign commerce at any point in time. 18 U.S.C. § 2252(a)(2)(B), (a)(4)(B); 18 U.S.C. § 2252A(a)(2)(B), (a)(5)(B). Any prior decisions of this court inconsistent with this holding are hereby overruled.

One way the Government can meet its burden of proving the jurisdictional element is by introducing evidence from which a reasonable jury could conclude the substance of an image of child pornography was made in a state and/or country other than the one in which the defendant resides. Defendant Sturm conceded this point, see *supra* n.4, and the Government presented sufficient evidence to prove it during Dayton's trial. We therefore remand these matters to the original panels for further consideration of Defendants' appeals in light of our holding.

09-1386, *United States v. Sturm*; 09-5022, *United States v. Dayton*

**HOLMES**, Circuit Judge, dissenting, joined by **HOLLOWAY**, Circuit Judge.

I respectfully dissent. The majority concludes that the term "visual depiction" in 18 U.S.C. §§ 2252, 2252A (2006) refers to the "substantive content" of an image of child pornography. *See* Maj. Op. at 2–3. I disagree. Under the versions of the statutes applicable here, in my view, the term "visual depiction" refers to a *particular* item containing an image of child pornography that is received or possessed by a defendant. I agree with the majority that the challenges of the two defendants, Christopher Dayton and Kenneth Sturm, "implicate the Government's burden of proving the interstate commerce element of the crimes charged." Maj. Op. at 14. I also agree that proof of that element *in part* "hinges on the meaning of the term 'visual depiction'" in §§ 2252 and 2252A. *Id.* at 15. Based on my reading of the statutes, and more specifically the term "visual depiction," however, I conclude that the government has not carried its burden of proof regarding the interstate-commerce element. Accordingly, I would reverse the convictions of Messrs. Dayton and Sturm.

## I.

## A.

The majority's interpretation of the term "visual depiction" cannot withstand serious scrutiny. The majority holds that "visual depiction" means "the substantive content of an image" and not the particular instantiation of an image received, possessed, or distributed by a defendant. *Id.* at 20. In other words, the

majority conceives of a "visual depiction" as an intangible "substance," the incorporeal "portrayal" of a scene. *See id.* at 14. But throughout its opinion, the majority cannot help but sneak concepts of physicality and tangibility into its definition.

1.

For example, as the majority rightly notes, *see id.* at 21, the statutes require a "visual depiction" to be "mailed," "shipped," or "transported" in interstate commerce. 18 U.S.C. §§ 2252(a)(2), 2252A(a)(2)(B) (2006). They also require a defendant to "receive[]," "possess[]," or "distribute[]" a "visual depiction." *See* 18 U.S.C. §§ 2252(a)(2), 2252A(a)(2)–(4) (2006). Manifestly, these kinetic concepts—mailing, shipping, transporting, receiving, possessing, and distributing—require some kind of tangible object. In English, we do not speak of transporting an incorporeal "substance" across state lines. When one brings a copy of the U.S. Code from Oklahoma to Colorado, one does not transport "the law." When a Kansas suitor sends a Valentine's Day card to his Utah sweetheart, we do not say that he mailed his "undying love" in interstate commerce. In the same way, if §§ 2252 and 2252A require a "visual depiction" to be "transported," "possess[ed]," etc. by a defendant, then "visual depiction" must refer to a tangible something rather than to some ethereal "content."

The majority finds support for its reading in 18 U.S.C. § 2252(a)(1)(B) (2006), which requires that a "visual depiction" be "*of such conduct*" (emphasis

-2-

added)—that is, of sexually explicit conduct by a minor.  *See also* 18 U.S.C. §§ 2252(a)(2)(B), (3)(B)(ii), (4)(B)(ii) (2006) (identical phrasing).  Says the majority, "Only the substance of an image can be 'of such conduct.'"  Maj. Op. at 20.  I could not disagree more.  Indeed, the majority has it precisely backwards.  It is the *conduct* portrayed in an image that is its offensive *substance*.  A visual depiction "*of*" such conduct refers to a *particular* instantiation of that substantive content—*viz.*, a *particular* image portraying that conduct.

An easy example defeats the majority's strained interpretation.  Imagine two identical photographs of the Eiffel Tower, one an original and the other a copy.  Each would be described as a photo or "visual depiction" *of* the Eiffel Tower.  What is the substantive content here?  Obviously, the Eiffel Tower—the subject of the photo, not the photo itself.  Each of the photos is a separate and distinct "visual depiction" *of* the same substantive content.  And of course, if I were to say that I had "mailed" or "transported" one of these visual depictions in interstate commerce, everyone (except perhaps the majority) would understand that to mean that I had mailed or transported a particular *photo*.  No one would say, for example, that I had mailed "the Eiffel Tower."

2.

-3-

Nowhere is the tangible character of a "visual depiction" more on display than in the affirmative defense set forth in 18 U.S.C. § 2252(c) (2006),[1] which is available to a defendant if he can show that he:

(1) possessed less than three matters containing any visual depiction proscribed by [18 U.S.C. § 2252(a)(4) (2006)]; and

(2) promptly and in good faith, and without retaining or allowing any person, other than a law enforcement agency, to access any visual depiction or copy thereof—

(A) took reasonable steps to destroy each such visual depiction; or

(B) reported the matter to a law enforcement agency and afforded that agency access to each such visual depiction.

If it is true, as the majority posits, that "visual depiction" means "substantive content of [an] image," Maj. Op. at 21, I am at a loss to understand how the low-level possessor of child pornography, for whom this defense was intended, could take advantage of it. How is such a defendant to "destroy" the "substantive content" of a pornographic image? It would not be enough to destroy *his* particular images because the "substantive content" would live on in the (likely) thousands of identical images possessed by others. And the majority cannot seriously contend (although, unfortunately, it attempts to do so, *see id.* at 22–23) that destruction of one particular image out of possibly thousands

---

[1]     A substantially identical affirmative defense appears in 18 U.S.C. § 2252A(d) (2006).

-4-

constitutes "reasonable steps" toward the eradication of the *content* of that image.

The majority explains away this anomaly by noting that "the term visual depiction is modified by the word 'such,' which is a reference to the visual depictions possessed by the defendant." *Id.* at 22–23. Well, *of course* that is true. The affirmative defense is most definitely concerned with the "visual depictions possessed by the defendant." *Id.* How else could he destroy, or take reasonable steps to destroy, those visual depictions?

The majority misses the point, though. The operative word here is not "such," which does little more than refer back to the same "visual depiction" previously referenced in the section. *See Webster's Third New International Dictionary* 2283 (1981) (defining "such" to mean "having a quality already or just specified—used to avoid repetition of a descriptive term"). Rather, the operative word is "each." The word "each" denotes a *particular thing*. *See id.* at 713 (defining "each" to mean "being one of two or more *distinct individuals*" (emphasis added)). The majority does not explain how "each" can possibly modify a word denoting only a nebulous "substance." Under the majority's reading, a defendant is required to "destroy each such [substantive content of an image]." *See* 18 U.S.C. § 2252(c)(2)(A) (2006). "[E]ach . . . content"? I daresay, that adjective and noun combination has yet to be uttered in our mother tongue. It is no less anomalous than "each pornography."

Naturally, the majority recognizes this difficulty, so it equivocates. In explaining how its interpretation squares with the language of the affirmative-defense section, it shifts to employing the term "visual depiction" the way that I do (and the way that I believe Congress intended)—as a particular tangible item. Thus, the majority makes reference to "the visual depictions possessed by the defendant" and "the one or two visual depictions [the defendant] is alleged to possess." Maj. Op. at 23.

By vacillating between "visual depiction" as incorporeal substance and "visual depiction" as a particular tangible, possess-able thing, the majority is trying to have its cake and eat it too. We are obliged not to interpret statutes that way. *See Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) ("[It is a] normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning." (quoting *Sorenson v. Sec'y of Treasury*, 475 U.S. 851, 860 (1986)) (internal quotation marks omitted)).

B.

There is an additional reason that the majority's interpretation of the term "visual depiction" simply cannot be right. By allowing the jurisdictional nexus of § 2252(a)(2) or § 2252A(a)(2)(B) to be satisfied with a showing that the "substantive content" of an image crossed state lines "in some form at some point in time," Maj. Op. at 14, the majority expands the statute's compass to the full

-6-

extent of Congress's Commerce Clause authority. The problem? Congress clearly did not flex all of its Commerce Clause muscle in this statute.

When Congress intends to exercise the full breadth of its power under the Commerce Clause, it uses particular language to do so. As the Supreme Court has said, "Congress is aware of the distinction between legislation limited to activities 'in commerce' and an assertion of its full Commerce Clause power so as to cover all activity substantially affecting interstate commerce." *Russell v. United States*, 471 U.S. 858, 859 n.4 (1985) (quoting *United States v. Am. Bldg. Maint. Indus.*, 422 U.S. 271, 280 (1975)) (some internal quotation marks omitted). Thus, the Court has construed the statutory phrase "engaged in commerce" as "a term of art, indicating a limited assertion of federal jurisdiction." *Am. Bldg.*, 422 U.S. at 280. And it has instructed us that the phrase "used in commerce" "is most sensibly read to mean active employment for commercial purposes, and not merely a passive, passing, or *past connection to commerce*." *Jones v. United States*, 529 U.S. 848, 855 (2000) (emphasis added).

By contrast, when the phrase "affecting commerce" appears in a federal statute, it "indicates Congress'[s] intent to regulate to the outer limits of its authority under the Commerce Clause." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115 (2001); *see also Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 273–74 (1995) (holding that the phrase "involving commerce" is functionally equivalent to "affecting commerce" and signals Congress's intent to regulate to

the full extent of its Commerce Clause power).  These principles are well-ingrained.  When we ignore them, we impose "[a] variable standard for interpreting common, jurisdictional phrases," bring "instability to statutory interpretation," and send conflicting signals to Congress.  *Circuit City*, 532 U.S. at 117.

The provisions of §§ 2252 and 2252A in force at the time of the defendants' convictions employ the phrase "in interstate . . . commerce."  For example, § 2252(a)(2) criminalizes the knowing receipt or distribution of "any visual depiction that has been mailed, or has been shipped or transported in interstate or foreign commerce."  18 U.S.C. § 2252(a)(2) (2006).  Similarly, § 2252A(a)(5) criminalizes the knowing possession of material "that contains an image of child pornography that has been mailed, or shipped or transported in interstate or foreign commerce."  18 U.S.C. § 2252A(a)(5)(B) (2006).  Because the statutes use the phrase "in . . . commerce," we are bound to construe them as "limited assertion[s] of federal jurisdiction."  *Am. Bldg.*, 422 U.S. at 280.

By way of contrast, §§ 2252 and 2252A have since been amended by the Effective Child Pornography Prosecution Act of 2007, Pub. L. No. 110–358, 122 Stat. 4001 (2008).  Section 2252(a)(2) now criminalizes the knowing receipt or distribution of "any visual depiction *using any means or facility of interstate or foreign commerce* or that has been mailed, or has been shipped or transported in *or affecting* interstate or foreign commerce."  18 U.S.C. § 2252(a)(2) (Supp. III

2009) (emphases added).  And § 2252A(a)(5) now criminalizes the knowing possession of material "that contains an image of child pornography that has been mailed, or shipped or transported *using any means or facility of interstate or foreign commerce* or in *or affecting* interstate or foreign commerce."  *Id.* § 2252A(a)(5)(B) (emphases added).  Under firmly established interpretive principles, these phrases—and particularly the phrase "affecting . . . commerce"—signal "Congress'[s] intent to regulate to the outer limits of its authority under the Commerce Clause."  *Circuit City*, 532 U.S. at 115; *accord United States v. Wright*, 625 F.3d 583, 600 (9th Cir. 2010) ("Congress chose to regulate to the outer limits of its Commerce Clause authority by inserting the 'affecting interstate commerce' language [into §§ 2252 and 2252A].");  *United States v. Lewis*, 554 F.3d 208, 216 (1st Cir. 2009) ("Congress . . . amended the child pornography statutes . . . to expand the jurisdictional coverage.  It did so by replacing all instances of 'in interstate' with 'in or affecting interstate' commerce.").

If the previous versions of §§ 2252 and 2252A (the versions applicable here) have a more restrictive jurisdictional reach than the newly amended versions under our well-settled understanding of the statutory terms used therein, it follows that any interpretation that pushes the previous versions to the outer reaches of the Commerce Clause power must necessarily be wrong.  The majority's interpretation of the statutes does just that.  Despite the drastic and

jurisdictionally significant differences in language between the earlier and later versions of the statutes, the majority's construction renders them identical.

The majority does not take a front-door approach in effecting this judicial alchemy. That is, it does not purport to expand the scope of the phrase "in interstate . . . commerce" to cover any activity connected in some fashion to interstate commerce. Such an endeavor would not be tenable, and the majority wisely does not attempt it. *See Jones*, 529 U.S. at 855 (stating that the phrase "used in commerce" "is most sensibly read to mean active employment for commercial purposes, and not merely a passive, passing, or past connection to commerce"); *Wright*, 625 F.3d at 592 n.7 ("Congress settled on the 'in interstate commerce' language [in the previous version of § 2252A] precisely because of its limited reach.").

Rather, the majority's expansion of federal jurisdiction comes in through the back door, via its rendering of the term "visual depiction." By allowing that term to encompass the "substance" of an image and by allowing the jurisdictional nexus to be satisfied by a showing that the "substance"—though not the particular image possessed by a defendant—crossed state lines "at some point in time," Maj. Op. at 14, the majority effectively transforms the statute's "in commerce" requirement into an "in or affecting commerce" requirement. Thus, even if a defendant acquires his particular image through a purely *intrastate* transaction, the fact that some prior iteration of the image traveled in interstate commerce (in

-10-

a past transaction having no connection to the defendant) will render him subject to federal prosecution. I find this impossible to square with the Supreme Court's admonition that a "past connection to commerce" is insufficient to satisfy an "in commerce" jurisdictional requirement. *See Jones*, 529 U.S. at 855; *see also Wright*, 625 F.3d at 594–96 (noting that "criminal statutes punishing the transmission of the relevant material 'in interstate or foreign commerce' require the *material itself* to cross state lines," and "reject[ing] the government's view that [a defendant's] entirely intrastate acts satisfy the statute's interstate commerce requirement solely because of *prior* interstate activity" (emphases added)).

The majority confronts neither the applicable statutes' requirement that a visual depiction be transported "in interstate . . . commerce," 18 U.S.C. §§ 2252(a)(2), 2252A(a)(5)(B) (2006), nor the fact that this language has since been amended—and expanded—to read "in *or affecting* interstate . . . commerce," 18 U.S.C. §§ 2252(a)(2), 2252A(a)(5)(B) (Supp. III 2009) (emphasis added); *see Wright*, 625 F.3d at 600 (holding that the amendments "effected a substantial change in section 2252A(a)(1)"); *Lewis*, 554 F.3d at 216 (holding that the amendments "expand[ed] the jurisdictional coverage").

Indeed, the majority's construction of the jurisdictional-nexus requirement makes the subsequent amendment superfluous. If the majority's interpretation is right, Congress would have found no need to expand federal jurisdiction. There

-11-

is good reason, therefore, to reject the majority's reading of the statutes. *See Milner v. Dep't of Navy*, 131 S. Ct. 1259, 1268 (2011) (declining to entertain an interpretation that would render a statutory provision superfluous and thus make irrelevant the subsequent amendment of that provision); *see also TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001))).

## C.

The majority's rejection of the defendants' argument rests on a false premise. The defendants argue, and I agree, that the *particular thing* received, possessed, or distributed by a defendant, be it a digital file or a tangible photograph, must have crossed state lines.[2] The majority castigates this approach, saying that it "would not extend to conduct involving the receipt or distribution of any image other than the original image." Maj. Op. 16. Thus, the majority reasons, under the defendants' and my reading, the statutes do not reach copies of

---

2    As suggested *supra*, this is a consequence, I believe, of the statutes' requirement that a visual depiction be "transported *in* interstate or foreign commerce," 18 U.S.C. §§ 2252(a)(2), 2252A(a)(2)(B) (2006) (emphasis added), as opposed, for example, to "in *or affecting* interstate or foreign commerce." *Compare Circuit City*, 532 U.S. at 115–16, *with Russell*, 471 U.S. at 859.

an original image "[e]ven though the substantive content of [the] copy would be identical to that of the original." *Id.*

Respectfully, the majority is operating under a misconception. No one has ever suggested that the statutes' reach is limited to first-generation images and does not extend to copies thereof. Nor is that the practical effect of my interpretation of the statutes in question. Sections 2252 and 2252A most certainly *do* cover copies, provided that a *particular* copy crossed state lines to reach the defendant.

This may be easily illustrated. Imagine that D in North Dakota takes a photo of a minor engaged in sexually explicit conduct using a Polaroid instant camera. He mails that photo (the original) to U in Utah. U wants to keep the original and send a copy to friend, so he creates a copy using a Xerox machine. He mails the copy to M in Maryland. M has received and is now in possession of a visual depiction of a minor engaged in sexually explicit conduct, and the particular visual depiction he possesses—the copy he received from U—was "transported in interstate . . . commerce." 18 U.S.C. §§ 2252(a)(2), 2252A(a)(2)(B) (2006). M is subject to federal prosecution. (So also, for that matter, are D and U.)[3] My reading of the statutes is therefore entirely consistent

_____

[3] In the digital context, the example is even more salient. Imagine that D in North Dakota takes the photo using a digital camera, then transfers the digital file to a shared-access folder on his laptop's hard drive, making that file

(continued...)

-13-

with Congress's intent, highlighted in the majority opinion, *see* Maj. Op. at 17–20, to reach not only the upstream creators of original pornographic images but also the downstream disseminators and consumers of copies.

## II.

A couple of final remarks. First, I recognize both that child pornography is despicable and that federal law can constitutionally—and now does statutorily—reach most intrastate transfers of such images. That said, we are called upon to interpret the laws as they are written, not as we would like them to be. Thus, the argument that my interpretation of the statutes here "hamper[s] the prosecution of child pornography cases in this circuit," *United States v. Dayton*, 426 F. App'x 582, 606 n.9 (10th Cir. 2011) (Briscoe, J., dissenting), *opinion vacated by* No. 09-1386, 2011 WL 6261657 (10th Cir. Apr. 4, 2011), seems to me to be not only completely irrelevant but also misguided. Congress used specific jurisdictional language in 18 U.S.C. §§ 2252, 2252A (2006) that signals to me—though not apparently to my colleagues in the majority—that the statutes do

---

[3](...continued)
available for download by others. U in Utah downloads the file to his computer. Of course, the *actual* file on D's laptop is not transferred. Rather, D's computer sends a copy of the information contained in the file to U's computer, and U's computer creates its own (identical) file out of that information. U has received and is now in possession of a visual depiction of a minor engaged in sexually explicit conduct, and the particular visual depiction he possesses—the file created from information he received from D—was "transported in interstate . . . commerce." 18 U.S.C. §§ 2252(a)(2), 2252A(a)(2)(B) (2006). U is subject to federal prosecution. (So, too, is D.)

not reach as far as they are constitutionally able. If there is any "hampering" here, it is Congress's doing—and, I would add, its intentional doing. *See Wright*, 625 F.3d at 600 ("The legislative history makes clear that Congress settled on the 'in interstate commerce' language because of its limited scope and squarely rejected an earlier proposed bill that would have reached conduct 'affecting interstate commerce.' By contrast, in 2007 Congress chose to regulate to the outer limits of its Commerce Clause authority by inserting the 'affecting interstate commerce' language.").

The majority's holding today serves to federalize an area of criminal prosecution that the applicable statutes deliberately left to the States. *See id.* at 592 n.7. Perhaps one might reasonably suggest that this a "just" result. However, the ends of justice cannot excuse our transgressing the rule of law.

Second, whatever one thinks of the majority opinion, it cannot seriously be maintained that it is not a sea change in the law governing federal child-pornography prosecutions. Allowing the government to satisfy the jurisdictional nexus in 18 U.S.C. §§ 2252, 2252A (2006) by showing that the "substantive content" of an image crossed state lines "in some form at some point in time," *see* Maj. Op. at 14, both washes away our prior precedent, *see United States v. Schaefer*, 501 F.3d 1197 (10th Cir. 2007); *United States v. Wilson*, 182 F.3d 737 (10th Cir. 1999), and is unique among our sister circuits, *cf. Wright*, 625 F.3d

583; *Lewis*, 554 F.3d 208. The defendants here could not have been on notice that such a rule would apply to their cases and, consequently, had no opportunity to defend against it. In fact, Mr. Sturm stipulated to the fact that the *originals* of the images he possessed were produced out of state. *See* Maj. Op. at 12 n.4. Under the majority's new rule, Mr. Sturm effectively stipulated to the jurisdictional nexus—an element of his conviction that he vigorously contested at trial, before his appellate panel, and in this *en banc* proceeding. Little could Mr. Sturm have known that his stipulation would be the death knell for his case. The majority's new rule, based on what I believe is an idiosyncratic and erroneous reading of the term "visual depiction," thus becomes a trap for the unwary in this case. I cannot help but be reminded of "Caligula's practice of printing the laws in small print and placing them so high on a wall that the ordinary man did not receive fair warning." *Huddleston v. United States*, 415 U.S. 814, 834 n.* (1974) (Douglas, J., dissenting).

At the very least, the rule of lenity would counsel a narrower interpretation of the term "visual depiction"—one that would not have the effect of altering "the federal-state balance in the prosecution of crimes." *Cleveland v. United States*, 531 U.S. 12, 25 (2000) (quoting *Jones*, 529 U.S. at 858) (internal quotation marks omitted); *see also United States v. Enmons*, 410 U.S. 396, 411 (1973) (rejecting an interpretation of the Hobbs Act that would work "an unprecedented incursion into the criminal jurisdiction of the States"); Note, *The New Rule of Lenity*, 119

-16-

Harv. L. Rev. 2420, 2430 (2006) ("When a broad interpretation of an ambiguous criminal statute would expand the scope of federal criminal law into areas traditionally left to the states, . . . the rule of lenity require[s] that the [c]ourt adopt the narrower reading.").

For all of these reasons, I respectfully dissent.